560 A.2d 1370

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Mark Anthony BECK, Appellant.**

Supreme Court of Pennsylvania.

Argued March 9, 1989.

Decided June 26, 1989.

James T. Davis, Davis & Davis, John M. Purcell, Uniontown, for appellant.

Alphonse P. Lepore, Jr., Dist. Atty., Mark E. Morrison, First Asst. Dist. Atty., Jack R. Heneks, Jr., Uniontown, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

Appellant alleges that his constitutional right to a fair trial was denied by the refusal of the trial court to permit a witness to testify on surrebuttal after that witness had given full testimony at the preliminary hearing which later was read at trial, but claimed the Fifth Amendment privi-

lege as to certain questions by both sides during the trial itself.

Appellant was convicted of murder in the third degree and sentenced to prison for a term of ten to twenty years. The crime grew out of an argument involving Appellant, a male victim, and Sandra Veatch, the critical witness in these proceedings. Following an argument in a local bar, the trio proceeded to the victim's trailer where the victim was shot to death after a quarrel concerning the company of the female. The murder weapon was found in Appellant's home. A neutron activation test indicated that the Appellant had fired a weapon but proved negative as to Sandra Veatch.

At the preliminary hearing, as well as throughout the entire proceedings, Appellant maintained his innocence by insisting that he had been knocked unconscious by the victim and could not have committed the act, or that a fourth unknown person in the trailer was the true killer. At the same hearing, however, witness Veatch testified freely that after the Appellant had pushed her and ripped her clothes, she started through a hallway to the bathroom and heard the Appellant say, "I'm leaving." (H.T., p. 11). She further testified that she heard "Boom, Boom," sounds which she identified as "gunshots." After that she heard a car start outside and drive away. She stated that it was the Appellant's car:

Q. You're sure it was Mark's car?

A. Um Hum. Nobody else was there, so who else's would it be? And I heard the muffler.

(H.T., p. 12).

As to the crucial question of whether another unknown party was in the car, therefore, the testimony of witness Veatch appeared to directly contradict the Appellant's argument in his defense.

In the defendant's case in chief, Appellant's lawyer, who had examined Veatch at the preliminary hearing, called her as a witness. Appearing with her own attorney, the witness stated that although she would answer some ques-

tions, she would exercise her Fifth Amendment privilege as to any specific questions pertaining to whether any other person was in the trailer, or whether she could identify the Appellant as the person who left in the car, or any other questions about those issues. While she gave extensive testimony (T.T., pp. 361–430) on other facts, she steadfastly refused to answer questions from both sides on what happened in the trailer as to those specific matters. In spite of defense counsel's pleas to the court to instruct her to answer, the court ruled repeatedly that she need not break her silence. She then refused to respond to these matters on numerous occasions. (See, for example, T.T., p. 382 ff., especially pp. 415–422). The court's rulings were based on its judgment, as explained to the witness, that if she were to testify presently in any way inconsistent with her prior testimony at the preliminary hearing, she could be subject to a charge of perjury. (T.T., pp. 365–366). While defense counsel continued to press the court to force an answer because counsel believed that a fourth unknown person was in the trailer, the court insisted in particular that in her prior testimony that no other person was there possibly could be construed as self-incrimination if she now changed her testimony on that point. (T.T., p. 410–412). Defense counsel's strategy of getting such information from the witness was frustrated by the continuing silence.

The defense's final witness was the Appellant himself. Once again he repeated his claim that either he had been pushed by the victim into a door where he hit his head and fell unconscious or had been knocked unconscious by an unknown assailant. In either case, the victim was alive at that point and logically another person did the killing. (T.T., p. 530).

After the defense rested its case, the Commonwealth called the court stenographer of the preliminary hearing who was permitted to read into the trial records certain portions of Veatch's prior testimony where she was cross-examined by defense counsel. (T.T., pp. 584–604). The prior testimony elicited on this occasion, pointed up again

Veatch's statement that she heard two shots and that no other person was in the trailer. (T.T., pp. 589–590). The prior testimony was permitted because, in effect, the witness was unavailable.

Defense counsel then replied with the following request to the court and prosecution:

MR. HORMELL: I do have a request to make of Mr. Wagner. It involves—may it please the Court, I have in my possession a written—a statement that was written by Sandra Veatch, which was sworn to before a notary public. This statement was obtained because Sandra Veatch had come to my office and requested to speak to me. I spoke to her and directed that she go home and put in her own handwriting the statement that she had made to me, which she did. She brought that statement to my office, and she swore before a notary public that that statement was true and correct.

May it please the Court, I want to do the same thing with that statement as the District Attorney did with the proceeding before the magistrate. I want to call the notary public and have her read from that statement the points I call attention to.

(T.T., pp. 605–606).

The Court refused the request on the grounds that the sworn statement given privately to defense counsel had not been subject to cross-examination by the prosecutor who was not present. (T.T., p. 609). At that point, defense counsel requested permission to call witness Veatch herself on surrebuttal.

MR. HORMELL: Your Honor, I want to tell the Court that I'm going to call Sandra Veatch. If the Court will not allow me to do it this way, with the statement, then I will be calling Sandy Veatch, and I'm going to go through this with each one of these and have her put on the record the Fifth Amendment. That's the only way I can think to do this. (T.T., p. 610).

\* \* \* \* \* \*

MR. HORMELL: I'm under surrebuttal, and what I am saying to the Court is this: I'm saying to the Court that I have evidence that what this girl has said, which testimony she said to me and swore that it was true before a notary public and also before a magistrate, and what I'm saying to this Court is that I have a right to ask her questions as to whether what she said was different than what she said at this magistrate's hearing. I have a right to do that because this testimony elicited at the magistrate's hearing, according to what Miss Veatch told me, was solicited by coercion. That being the case, I have a right to inquire into that, I have a right to ask those questions. If she tells me that she takes the Fifth Amendment, I can't do anything about that, but I have the right and the obligation, Your Honor, to make that inquiry. (T.T., pp. 612–613).

Although the Commonwealth objected in that it was not proper surrebuttal, witness Veatch was allowed to take the stand without the jury. The court's purpose was "to find out what's going to happen before we bring the jury in." (T.T., p. 623). Specifically, the court wanted to ascertain, first, if the witness would continue to exercise her Fifth Amendment rights, in which case any further questioning would be futile, and, second, whether defense counsel was engaging in proper surrebuttal by addressing only issues raised on rebuttal by the prosecutor. Throughout this discussion before the court, Veatch's own attorney advised the judge repeatedly that he was warning her to exercise her privilege on questions specifically related to her knowledge of whether she saw an unknown party in the trailer and whether the Appellant shot the victim.

The following relevant discussion then took place:

THE COURT: What other questions—just give us a list of the questions you want to ask her.

MR. HORMELL: I want to know whether she heard any other vehicle besides Mark's. I want to know whether she heard any other voices besides Mark's. I want to know whether she knows if there was anyone in that

trailer besides Mark. I want her to testify as to how she knows—if she knows whether Mark could have shot this party. I think she's competent to testify to all of those, and I think she can, Your Honor.

MR. WAGNER: Judge, she was asked all of—if not, every one, and I believe it's every one of those questions in direct or cross and she has previously taken the Fifth Amendment on those. I don't want to lose sight of the fact that the only reason that testimony from the transcript was permitted in was because her claiming the Fifth Amendment made her unavailable. He is now trying to use—to rehabilitate his own witness. She's not my witness, and the purpose of asking those questions is to attempt to rehabilitate her and he cannot do that in surrebuttal.

\* \* \* \* \* \*

THE COURT: Mr. Hormell, she was asked in that hearing whether or not anyone else was there, and it's on page 12. She was asked if she heard anyone else leave, and it's in that transcript. She was asked all four of those questions in that hearing and answered all of those questions. Now, anything, that she would say at this time would be a contradiction, under oath, with what was said at that time and, therefore, would be tending to incriminate herself. You had an opportunity to ask her those questions on the stand in this proceeding, at the magistrate's hearing, and you had a right to cross-examine her at that time, and you did, on those things and asked her those questions and you can't ask her those again at this time.

\* \* \* \* \* \*

THE COURT: Well, you just tell us if you are going to take the Fifth or you're not.

THE WITNESS: I'm going to answer the questions.

MR. KUZDENYI: May it please the Court, I want it understood that I—

THE WITNESS: It's important.

MR. KUZDENYI: I have advised my client that she has a right to plead the Fifth Amendment and this is a decision she has to make herself. As I understand it now, she has made a decision that she would rather answer the questions. I want it understood that I'm being relieved of any responsibilities in this case relative to client/attorney relationship. My advice to her would be, to prevent self-incrimination, to take the Fifth Amendment.

MR. WAGNER: Judge, the point that I wish to make from the Commonwealth's prospective (sic) is that it doesn't matter at this point what this witness wants to do. It is not proper surrebuttal to recall her at this point to have her now go back and change her direct or cross-examination testimony or to attempt to explain or contradict the testimony given at the preliminary hearing. To do that, he's trying to rehabilitate his own witness and he cannot do that under any legal principle that I'm aware of. She cannot testify at this point as he's attempting to do.

MR. HORMELL: May it please the Court, the only time that rehabilitation is an issue is when there is testimony to rehabilitate and there has been no testimony to rehabilitate because she's not answered any questions and, therefore, the District Attorney's arguments are not applicable to this particular situation.

MR. WAGNER: They certainly are, Your Honor. She was asked every one of those questions a day ago and she refused to answer them. We can't sit here and at her whim and decide when she's going to take to us and when she's not. It's simply not proper at this point.

THE COURT: We are not going to let her answer those particular questions. They were asked on direct and on cross, and this is improper surrebuttal. You have an exception. (T.T., pp. 629–634).

Our analysis of the issue of whether she should have been allowed to testify must begin with a reminder that this was a capital case in which the judge charged the jury on homicide, including murder of the first degree. (T.T., pp.

708–713). We also recognize that the refusal of a court to permit either side to present additional testimony is a matter of discretion and will not be overturned in the absence of abuse. *Anastasi Bros. Corp. v. Commonwealth,* 455 Pa. 127, 315 A.2d 267 (1974); *Commonwealth v. Deitch Co.,* 449 Pa. 88, 295 A.2d 834 (1972). We take particular notice of the fact, however, that witness Veatch finally was prepared to answer critical questions regarding the issue of whether other actors were present at the scene. Her newlyfound willingness to speak was in direct response to the court's last-ditch efforts to ascertain that very fact. Finally, we point out that the jury was still sitting.

The ultimate end of our constitutional system in these narrow circumstances is to assure the "accuracy of the truth-determining process." *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). In such an appropriate case, established rules of trial procedure essential to due process take on an aura of "technicality" and must bow to other legitimate interests in the criminal trial process. While we stand firmly behind accepted rules of procedure, the refusal of the court to allow the witness to testify when she was willing to do so constituted an unacceptable adherence to procedure which impaired the "accuracy of the truth-determining process." The impact of that decision was to prevent a defendant facing the block from fully developing his defense, and we reject the notion that the criminal process may be governed by technicality or by narrow definitions of legal rules. In this context, the order of proof need not be understood to have been chiseled in stone.

That a trial judge properly may permit a plaintiff who has rested to reopen his case for the purpose of offering additional testimony is well-settled in our law. In *Seaboard Container Corp. v. Rothchild,* 359 Pa. 51, 58 A.2d 800 (1948), we decided:

It is well settled that a trial court, for the purpose of receiving further evidence, may reopen a case after the parties have rested, though it should never do so except

for good reasons and on a proper showing, and this power continues after the case has been given to the jury and before they have delivered their verdict.

58 A.2d at 802. A case may be reopened especially where it is desirable that additional testimony be taken in the interest of a more accurate adjudication and where an honest purpose would be justly served without unfair advantage. *In re: J.E.F.*, 487 Pa. 455, 409 A.2d 1165 (1979).

Moreover, we have permitted a relaxation of rules in appropriate circumstances involving the ascertainment of truth. In *Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875 (1976), for example, we held that the application of a state rule preventing a defendant from cross-examining or contradicting his own witness can violate due process "in some circumstances." In reference to the same rule, our decision in *Commonwealth v. Smith*, 424 Pa. 544, 548, 227 A.2d 653, 655 (1967), held that:

This rule has been considerably relaxed to prevent injustice and the tendency of the courts is *to permit parties to show the truth without strict regard to technicalities.* (Emphasis in original.)

The above quotation was taken from *Commonwealth v. Deitrick*, 221 Pa. 7, 70 A. 275 (1908). We also relax the rule of waiver in capital punishment cases specifically in order to get to the truth. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982); *Commonwealth v. Logan*, 519 Pa. 607, 549 A.2d 531 (1988).

There are unforeseen problems which occur at trial that are not susceptible of exactly defined limits in advance, but which are to be resolved as they arise in the interests of justice and a fair trial. We conclude that this is such a case and, aside from the blind adherence to a procedural rule, we find no sensible reason to bar the testimony of witness Veatch. As Mr. Justice Lewis Powell observed: "in modern criminal trials, defendants are rarely able to select their witnesses: they must take them where they find them." *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), as quoted in *Gee*, 467 Pa. at 137–138,

204

354 A.2d 875. Here the Appellant found his witness willing to talk and he should not be denied the opportunity to get her evidence.

We remand for a new trial in accordance with this decision.